# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TOMMY CLARK, K77216 | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 14-CV-03936 |
| | ) | |
| JACQUELINE LASHBROOK, Warden, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Petitioner Tommy Clark's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). Clark, who is a member of the Gangster Disciples street gang, is currently serving a life sentence at the Menard Correctional Center located in Menard, Illinois for the 1997 double murder of Kevin Martin and Julio Meza. Respondent Jacqueline Lashbrook is the Menard facility's warden.[1] In his petition, Clark identifies five grounds for relief. Some of his claims are procedurally defaulted, however, and the remainder, though not frivolous, fall short for the reasons that follow. Accordingly, the petition is denied.

## FACTUAL BACKGROUND[2]

In November 1997, petitioner Tommy Clark, Amos Chairs, and Traye Booker were charged with strangling to death, and then robbing, Kevin Martin and Julio Meza during the evening hours of August 21, 1997. Chairs and Booker were tried together while Clark was tried

---

[1] When filed, Clark's petition named Kim Butler, who was then the warden, as Respondent. The Court has substituted the current warden, Jaqueline Lashbrook, as Respondent pursuant to Fed. R. Civ. P. 25(d). *See also* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Court.

[2] Factual determinations by state courts are presumed to be correct unless a petitioner offers clear and convincing evidence suggesting otherwise. *Miller v. Cockrell*, 537 U.S. 322, 324 (2003). Here, Clark has offered no such evidence. Accordingly, the factual background is derived from the record established in the state court proceedings below.

alone. In the joint trial of Chairs and Booker, Chairs was ultimately convicted while Booker was acquitted. In August 1999, a jury convicted Clark on all counts and the trial court sentenced Clark to life in prison without the possibility of parole.

The murders occurred at a bar that Martin owned—known as "Johnny's Club"—located at 71st and Western in Chicago, Illinois. At trial, the prosecution's general theory was that Chairs, Clark, and Butler, who were all members of the Gangster Disciples street gang, agreed to meet Martin and Meza at Johnny's Club and to pretend to be interested in purchasing drugs when in fact they intended to steal the drugs from Meza. Because they had no direct evidence of who killed Martin and Meza, the prosecution sought to prove that Meza and Martin were killed during the course of this robbery and that Clark was responsible for the murders under an accountability theory based on his participation in the robbery. Although the prosecution was unable to provide any physical evidence linking Clark to the murders, they were able to offer significant circumstantial evidence implicating Clark in the robbery and murder.

This evidence included the testimony of Stacy Lynn Jones, who at the time of the murders was dating Chairs. She testified that while dating Chairs she learned that he was a "Governor" within the Gangster Disciples and that Clark was his "Assistant Governor." Resp't Ex. D at 4, ECF 18-4. As leaders within the Gangster Disciples organization, Chairs and Clark were responsible for overseeing the gang's operations in a portion of Chicago's south side. *Id.* According to Jones, Clark "was with [Chairs] like glue" and was Chairs' "right hand man." Supplemental State Court Record ("Supp. R."), ECF 27-5 at 157-158; Tr. A-156; -158]. After his arrest, Clark acknowledged that he had obtained his rank of Assistant Governor in the gang from Chairs. When asked what an assistant governor does, Clark responded: "he helps the governor." Supp. R., ECF 27-1, at T-89.

During trial, Jones recounted her interactions with Clark and Chairs in the weeks leading up to the murders. She testified that in August 1997, she was driving a rented Plymouth Breeze, which Chairs also occasionally drove. Resp't Ex. D at 4. She recalled that during the first week of August, Chairs was driving her car to an unspecified location while she rode in the front passenger seat and Clark was in the back seat. During this car ride, Chairs proceeded to tell Clark that Kevin Martin knew a "Mexican" who was in possession of fifty pounds of marijuana. *Id.* Chairs indicated to Clark that he wanted to steal the marijuana so the Gangster Disciples could sell it for $800 a pound. *Id.* Jones offered no testimony indicating that Clark responded to Chairs' plan.

Approximately one week later, according to Jones, Chairs drove Clark and her to a bar on 59th and San Francisco. *Id.* at 5. Chairs then told Clark that he was going inside to meet Martin, who was going to introduce Chairs to the Mexican who supposedly had the marijuana. *Id.* When they arrived at the bar, Chairs instructed Clark and Jones to wait in the car. *Id.* Jones recalled that Chairs returned to the car about fifteen minutes later and said that Martin was not inside, but that the Mexican was and he had in his possession of a large amount of cocaine. *Id.* Chairs and Clark briefly discussed a plan to steal the cocaine from the Mexican, but they ultimately decided not to do so at that time because they did not have enough cash to create a bankroll that was physically large enough to deceive the drug supplier as to their bona fides (they discussed papering the outside of the roll with twenties while the inside would consist of singles). *Id.*

A week later, in the early afternoon of August 21, 1997, Chairs and Jones picked up Clark and drove to 74th and Parnell. *Id.* Chairs was driving, with Jones seated in the front passenger seat, and Clark seated in the back. Chairs then explained to Jones that he was going to drop her off and that "we are going to take the bud [marijuana] from the Mexican and Kevin."

Dkt 27-5 at 141; Tr. A-140. Chairs then dropped off Jones and Clark climbed into the front seat of Jones's car. At approximately 5:00 p.m. (according to Jones), Chairs returned to pick her up and told her that the "Mexican" had refused to give up the drugs, but not to worry because "folks took care of it." Resp't Ex. D at 5. Chairs then instructed Jones to get rid of her cellphone because it had been used to contact Martin. *Id.* Clark was not present for this conversation.

A few days later, Chairs, while driving with Jones, stopped at the corner of 79th and Vincennes and spoke to another Gangster Disciple (who is not otherwise identified in the record). The Gangster Disciple asked Chairs if he "had something to do with what happened on 71st where they found [the victims] duct-taped and in the garbage can." *Id.* at 5-6. Chairs answered that he had nothing to do with anything that happened on 71st Street. Assuming that Chairs was lying to the other Gangster Disciple, Jones later told Chairs that she was worried the police would be able to lift his fingerprints off the duct tape. Chairs responded with "it wasn't no duct tape and [the victims] wasn't in no garbage can." *Id.* at 6. Chairs instructed her that if the police came and asked her where he was the evening of August 21, she was to tell them that he was with her. *Id.* Again, Clark was not present for this conversation.

The State then offered the testimony of Tanya Robinson, who occasionally worked as a bartender at Johnny's Club and had known Martin for eleven years. *Id.* at 7. She testified that on August 21, 1997, at approximately 7:00 p.m., she was drinking in Johnny's Club and saw Clark, Chairs, Booker, Martin, and another man she knew as Bud Mayor, sitting at the bar talking among themselves. *Id.* She finished the beer she was drinking and then left the bar. *Id.* Bud Mayor also left at this time. *Id.*

Robinson then went to her friend's house a few blocks away. She testified at trial that she returned to the bar "like maybe I say a few minutes. Maybe a couple of hours. I'm not sure."[3] Supp. Record, ECF 27-1, T-12. When she returned, the front door of the bar was locked. *Id.* She knocked on the door and Martin let her inside. She observed Clark, Chairs, and Booker get up from bar stools and walk towards a bedroom in the back of the bar. *Id.* Martin put money in the jukebox, turned the volume up, and proceeded to follow the others into the back bedroom. *Id.* Robinson listened to the music for a short time before going to use the restroom, which was located directly across the hall from the room the group had just entered. *Id.* As she left the restroom, Robinson heard Chairs say, "Where's the stuff at, where's the shit at?" A voice with a "Mexican accent" she did not recognize then said, "please don't do this, please don't do this." *Id.* at 7-8. She testified that another unknown voice then said, "He knows where it's at. He knows where it's at." *Id.* at 8. Robinson indicated that she did not believe this voice belonged to Chairs, Booker, or Martin and that it lacked the distinct accent that the previous "Mexican" voice had. *Id.* Martin then stated, "tell him what they want to know, tell them what they want to hear." *Id.*

Robinson proceeded back towards the main part of the bar and sat down to finish her beer. *Id.* A short time later she turned to see Booker exiting the bedroom and approaching her, while she simultaneously heard someone leave through the backdoor. *Id.* Booker placed one hand on her shoulder and with the other hand gave her a ring and told her "if this ring get [sic] back to the police, we'll know you told. And if you tell them anything you heard tonight . . . I'll kill you." *Id.*

---

[3] Robinson had previously testified in front of a grand jury that she had only left the bar for a few minutes. At trial, Robinson explained her inability to estimate the elapsed time by indicating that she was not wearing a watch. The discrepancy between Jones' account, which indicated that Chairs told her that "folks took care of it" sometime around 5:00 p.m., while it was light outside, and Robinson's account, which suggested that the murders occurred later in the evening, around 9:30 p.m., was a point of emphasis during the defense closing argument.

Booker left and Robinson continued to sit at the bar until the music ended. *Id.* She walked towards the back and called Martin's name but heard no response. *Id.* She then looked into the back bedroom and saw Martin and Meza lying on the floor. *Id.* Suspecting they were dead, she ran home. *Id.* Robinson admitted that she did not know how many people were in the back bedroom, but maintained that she was sure that she saw Clark, Chairs, Booker, and Martin enter the room. *Id.* On cross examination, Robinson also admitted that she had used heroin a few times that month and was given money to relocate as a result of her cooperation with authorities. *Id.* at 9. Robinson also testified that she had previously had sex with both Chairs and Booker, a fact she acknowledged she had not told police when they questioned her about the events at the bar on the night of the murders. *Id.*

Chicago Police Detective Edward Winstead testified that he responded to a call concerning the discovery of the murders at the bar the following morning, at approximately 11:15 a.m. *Id.* at 2. He entered the tavern through the main door and saw no evidence of a forcible entry. He then proceeded towards the back of the bar through a swinging door that opened into a six-foot hallway. *Id.* At the end of the hallway was the rear door to the tavern. To the left of the hallway (as one faced the rear) were a restroom and a janitor's closet, and on the right side was a door that opened into a narrow kitchen. Inside the kitchen, Winstead found the entry to a bedroom where he found the bodies of Martin and Meza.

Winstead testified that Martin was lying face down on the bed, hogtied with a blue electrical cord and with a gag in his mouth. *Id.* at 2-3. He inspected the body and saw that Martin had a deep ligature mark across his neck that was consistent with strangulation. *Id.* at 3. Martin did not have his wallet or anything of value on his person. He found Meza on the floor a few feet

from the doorway; Meza was also gagged and bound with blue electrical cord and a piece of light-blue cloth. Meza's pockets had been turned inside out.

Winstead testified that he proceeded to interview the two individuals who initially found Martin and Meza. *Id.* They indicated that Traye Booker was at the scene when the bodies were discovered. *Id.* Authorities then found Booker, who was still in the vicinity of the bar, and discovered he was wearing Martin's jewelry. *Id.*

Police also interviewed Robinson that day, but she did not disclose what she had witnessed at the bar the night before. *Id.* Instead, she told police that Martin had passed out on a pool table and that she had helped him up and then proceeded to have sex with him. *Id.* at 9. On August 29, 1997, the authorities again questioned Robinson and she reiterated her prior statement. She did not provide an account consistent with her trial testimony until the morning of August 30. At trial, Robinson indicated she had lied to police because she thought that Booker would kill her if she told the truth. *Id.* On September 1, 1997, Robinson identified Chairs and Booker in a police lineup, and Clark in a photo array, as the individuals she saw inside Johnny's Club the night of August 21. *Id.* at 9.

Clark was arrested soon thereafter. The felony review prosecutor, Assistant State's Attorney Patrick Kelly, testified that he met with Clark on October 2, 1997 (with a Detective Sikarski, who did not testify) to see if he was willing to cooperate with the investigation. *Id.* Clark indicated that he understood his Miranda rights and initially agreed to talk with Kelly. *Id.* Clark proceeded to tell Kelly that he knew nothing about the murders of Martin and Meza and that he had never even been to Johnny's Club. *Id.* Kelly showed Clark a picture of Chairs and a picture of Booker. *Id.* Clark indicated that he knew both men, and admitted that all three of them were members of the Gangster Disciples. *Id.* When Kelly asked Clark where he was on August

21, 1997, Clark immediately responded that he had been with his girlfriend, Shawna. *Id.* at 10. Clark told Kelly that he went to Shawna's house around 2:30 p.m. and remained there until 9:00 p.m. *Id.* Clark maintained that Chairs then picked him up and the pair drove around for about thirty minutes. *Id.*

Later, Kelly informed Clark that he would be placed in a lineup, prompting Clark to ask to speak with Kelly again. Clark then told Kelly that when he and Chairs had left at 9:00 p.m. they had in fact gone to 71st and Western. *Id.* Clark said that when they got there, Booker was standing on the corner wearing a gold watch. *Id.* Clark asked Booker where he got it, and Booker responded, with a smirk, "it's mine." *Id.* at 10-11. Clark then told Kelly that he had been to Johnny's Club three times in the past and that he had been there the night *before* the murders but not the night of the murders. *Id.* Kelly then left Clark for a short period of time. He returned and informed Clark that his girlfriend did not support his alibi. Clark then became agitated and said that "Shawn[a] is lying and everyone else is lying and this is just a conspiracy." *Id.* at 11.

The State rested its case after Kelly's testimony. *Id.* Clark's trial counsel then moved for a directed verdict, which the trial court denied. Clark elected not to take the stand, and the defense rested. *Id.*

Clark's defense counsel then presented his closing argument, maintaining that the state failed to offer any evidence physically connecting Clark to the murders or any evidence that Clark agreed to facilitate the commission of the robbery:

> Agrees to aid. Where's the agreement? He didn't say a word. Where's the agreement? Or attempts to aid. Where's the attempt? What was the attempt? What was the attempt to aid in the commission of this crime, of the murder, of this robbery? Where is it? Where's the attempt?

Supp. Record, ECF 27-1, at T-155. Clark's counsel pointed out that none of the State's witnesses testified that they observed Clark in the back room and that it was possible he had left out the back door before the killings occurred:

> There's a back door, and when she came in there, she didn't see anybody else, any other person, other than the people that, those four people that were there. So, she didn't know who was in the back. Could be one person, could have been two, could have been five. You just don't know. We don't know where Tommy went, if you believe that he was there. He went in the back. Do you have any evidence as to where Tommy went? Did he go out the back door? Do we know whether he withdrew, came back, went out? Do we know this?

*Id.* at T-150-151. Clark's counsel also highlighted the inconsistencies in Robinson's statements to police.

In rebuttal, the prosecutor offered the following argument:

> He wants you to find the defendant not guilty because nobody saw Tommy Clark go out around the back. Nobody saw Tommy Clark around the back. Nobody saw Tommy Clark come back out. Nobody saw Tommy Clark come back out. Nobody saw Tommy Clark come and take the money from the cash register. No one saw that. Well, when this defendant talked to the police, what did he tell the police? He tells the police, I don't know nothing about no murders. I don't know anything about that. So then Assistant State's Attorney Kelly talks to him a bit longer, and we come up [sic] story with the girlfriend. Well, that doesn't quite work, because we talked to the girlfriend. Okay. Listen, Mr. Clark, you're about to stand in a lineup.
>
> [Clark's Counsel]: Your Honor, objection.
>
> [The Court]: Overruled. Proceed.
>
> [Prosecutor]: Thank you, your Honor. Facts. I want to talk to you—you want to talk about facts? I didn't hear one fact from this table over here regarding a statement**.**
>
> [Clark's Counsel]: Objection, your honor. I would have a motion.

Resp't Ex. D at 19.

At sidebar, Clark's trial counsel moved for a mistrial arguing that the prosecutor's statements impermissibly shifted the burden of proof onto the defendant. The prosecutor told the judge that he was referring to the statements Clark had made to the police. The trial court found that the prosecutor's statements did not shift the burden of proof because he was simply pointing out inconsistencies in Clark's statements to police.[4] The prosecutor then resumed his argument and continued to point out that Clark's story had changed after he was informed that he was being placed in a lineup, and that Clark had admitted that he had been in the bar, most recently only the night before the murders. As the prosecutor noted, however, the ASA questioning Clark had not told him what night the murders were committed.

In response to Clark's argument that the state offered no evidence that Clark agreed to help Chairs with the robbery and the murders, the prosecution's response included the following:

> [Prosecutor]: In this case, the rank was held by governor, [Chairs]. His assistant governor was [Clark]. He doesn't—the Gangster Disciple guys, like these two, they don't sit around in front of Stacy and lay out the whole plans for 'em. They are not stupid. It doesn't take that. It takes a nod, a wink, jumping in the front seat, to know that you are going along with the plan. That's reality. That's how the Gangster Disciples operate.

*Id.* at 21. Clark's defense counsel objected to the above argument but was overruled by the trial court. *Id.* The court then instructed the jury on the law, and the jury began its deliberations. It found Clark guilty on both first degree murder charges and the robbery count.

---

[4] In further discussion after the arguments had been completed, the prosecutor explained that he was making the point "that there were no questions asked of [the Felony Review ASA] regarding . . . the specific statement of Mr. Tommy Clark . . . . I was in no way suggesting, either directly or indirectly, that this defendant should have testified, or infringe on the burden of proof." The trial judge responded by noting, "That was my understanding as well." Supp. R., ECF 27-1, at T-199 – T-200.

**PROCEDURAL HISTORY**

After judgment was entered against him, Clark filed a timely direct appeal arguing that the State had failed to prove his guilt beyond a reasonable doubt. ECF No. 18-4, Ex. D, 1. Clark maintained that the State offered no evidence indicating he had the intent to promote the robbery or murders and that there was no evidence indicating that he was present at the scene when the murders were committed. *Id.* Clark also argued that he was denied his right to a fair trial, maintaining that it was prosecutorial misconduct for the prosecutor to comment on Clark's failure to testify, and that the prosecutor's statements about how Gangster Disciples "operate" amounted to impermissible "prosecutorial testimony." *Id.*

A majority of the Illinois Appellate Court panel presiding over Clark's direct appeal rejected Clark's arguments. *Id.* at 22. With respect to Clark's sufficiency of the evidence claim, the panel's majority concluded that "the totality of the evidence was sufficient for the jury to find defendant guilty beyond a reasonable doubt." *Id.* at 15. The court noted that the testimony of Chair's girlfriend, Stacy Jones, indicated that Chairs had discussed his plan to steal the marijuana from the "Mexican" with Clark. The testimony of Tanya Robinson placed Clark at Johnny's Club the evening of the murders, and she saw Clark go into the back room along with Martin, Chairs, and Booker. ASA Kelly testified that Clark had altered his story after he indicated that Clark was going to be placed in a line up. The court reasoned that the testimony of these three witnesses, taken together as a whole, provided sufficient circumstantial evidence for the jury to find Clark guilty beyond a reasonable doubt.

As to Clark's argument that the prosecutor's remarks denied him a fair trial, the court noted that a prosecutor is given "considerable leeway in making closing and rebuttal arguments and is allowed to argue the evidence and reasonable inferences drawn from that evidence." *Id.* at

19 (citing *People v. Aleman*, 313 Ill. App. 3d 51, 66 (2000)). In finding permissible the prosecutor's remark that he "didn't hear one fact from this table over here regarding a statement," the majority concluded that the prosecutor was simply highlighting the inconsistencies in Clark's alibi statements after his arrest, rather than an attempt to draw attention to his failure to testify. *Id.* at 20.

With respect to the prosecutor's statement that "[i]t takes a nod, a wink, jumping in the front seat, to know that you are going along with the plan. That's reality. That's how the Gangster Disciples operate," the panel majority concluded, without making a finding as to the propriety of the prosecutor's statements, that the "statements by the prosecutor did not substantially prejudice the defendant." *Id.* at 21-22. The dissent disagreed, maintaining that the trial court committed reversible error by allowing the prosecutor to offer evidence indicating how the Gangster Disciples operated. *Id.* at 24. The dissenting judge also opined that it was impermissible for the prosecutor to indirectly comment on Clark's failure to testify. *Id.* Clark's Petition for Leave to Appeal to the Illinois Supreme Court ("PLA") was denied without opinion on January 28, 2004.

Clark then filed a pro se post-conviction petition, which alleged the trial court and trial counsel violated his right to an unbiased jury by failing to question potential jurors about possible bias against street gangs. ECF No. 18-10, Ex. J, 5. The state court subsequently appointed post-conviction counsel for Clark, who submitted a supplemental petition adding, among other claims, that Clark's trial counsel was ineffective for failing to urge Clark to accept the State's plea deal offer of a twenty-year sentence with time served. At an evidentiary hearing, Mercedes Luque-Rosales, who had been assigned to the Cook County Felony Trial Division during Clark's trial, testified that on the day of jury selection, the lead prosecutor waived over

Clark's trial counsel and told him, "See if your client will take twenty." *Id.* at 7. She said that Clark's counsel immediately perked up and went back to the lockup area where Clark was being held. Clark's counsel returned a short time later and communicated that Clark had rejected the offer, indicating that Clark thought "if you are giving an offer like that on either game day or the day of the trial, he believes there is something wrong with your case." *Id.* After the evidentiary hearing concluded, the Circuit Court declined to grant Clark post-conviction relief.

On appeal, Clark argued that the trial court and trial counsel violated his right to an impartial jury by failing to ensure that seated jurors were not biased against Clark simply because he was a member of the Gangster Disciples street gang. Clark also argued that his trial counsel was constitutionally ineffective for failing to request an accomplice-witness instruction for Jones' testimony. The appellate court rejected these claims on the grounds of waiver because Clark had failed to raise them on direct appeal. *Id.* at 9.

Clark also maintained that his appellate counsel was constitutionally defective for failing to argue that the trial court improperly admitted the "hearsay" testimony of Chairs and ASA Kelly and that his trial counsel was constitutionally defective for failing to encourage him to take the State's plea deal. The court rejected these arguments on their merits, holding that Clark's counsel did not render constitutionally inadequate representation.

Clark filed a Petition for Leave to Appeal his post-conviction proceedings with the Illinois Supreme Court. That petition was summarily denied on November 27, 2013. Clark filed this timely pro se petition for habeas corpus on May 27, 2014.[5]

---

[5] The one-year statute of limitations applicable to habeas petitions was tolled during the nine-year pendency of Clark's state court post-conviction proceedings. 28 U.S.C. § 2244(d)(2).

## ANALYSIS

In his pro se § 2254 petition, Clark raises five claims. First, he maintains that the trial court violated his right to due process by failing to question potential jurors about anti-gang bias. Second, he argues that his trial counsel was ineffective for also failing to question potential jurors about anti-gang bias, failing to request an accomplice-witness instruction, failing to argue that a number of statements were inadmissible hearsay, and for failing to advise Clark to accept a plea agreement that called for a twenty-year term of imprisonment. Third, Clark contends that his appellate counsel was ineffective for failing to raise these claims of ineffective assistance on the part of his trial counsel. Fourth, Clark maintains the evidence was insufficient to support his conviction for murder under an accountability theory. And fifth, he asserts that the prosecutor violated due process in his rebuttal argument by "testifying" about "how gang members operate" and by impermissibly shifting the burden of proof onto Clark by "commenting" on his failure to testify.

Although a court must construe a pro se petition pursuant to § 2254 liberally, *see Ward v. Jenkins*, 613 F.3d 692, 697 (7th Cir. 2010), the Court cannot consider the merits of a number of Clarks claims due to procedural default. Specifically, because the post-conviction appellate court decided that Clark had failed to raise on direct appeal—and therefore waived—his claims that both the trial court and his trial counsel failed to question jurors about gang bias and that his trial counsel was also ineffective for failing to request an accomplice witness instruction, those rulings will remained undisturbed. Clark's remaining ineffective assistance claims are rejected on their merits, as the post-conviction appellate court reasonably applied controlling federal law. *See* 28 U.S.C. § 2254(d)(1). Likewise, Clark's claim that there was insufficient evidence to support his conviction is rejected because the state court on direct appeal reasonably applied the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). And though reasonable minds

could differ in their assessment of whether comments by the prosecutor during rebuttal argument deprived Clark of a fair trial—as evidenced by the split opinion of the state appellate court on this issue—Clark has not established that the state court on direct appeal unreasonably applied controlling Supreme Court precedent in holding that the prosecutor's improper closing remarks did not deny Clark his right to a fair trial. Accordingly, Clark's petition must be denied.

## A. Procedural Default

As a threshold matter, Clark did not raise a number of these claims on direct appeal, and they are therefore procedurally defaulted. Before seeking habeas relief, a petitioner must fairly present his federal claims at every available level of the state's courts for review. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (exhaustion doctrine requires that state be provided with "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary appeal to the State Supreme Court). Further, the petitioner must not only present his arguments to the state courts but also alert them, at least in general terms, that there is a federal constitutional basis for the arguments. *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If state courts are to be given the opportunity to correct alleged violations of a prisoners' federal rights, they must be surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."). When reviewing a petition for a writ of habeas corpus, a federal court will not review a question of federal law if the state decision rested on an adequate and independent state ground for dismissal, which includes a finding that the petitioner failed to comply with a state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Otherwise, "[a]ny such ruling on the federal claims would be advisory, given the fact that on remand the state court

would still deny petitioner relief on the independent and adequate state law ground." *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009).

A "finding of waiver by the state post-conviction court is enough to establish an adequate and independent state ground" because such a finding indicates the petitioner failed to comply with a state procedural rule. *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009). In determining whether a claim has been waived and thus procedurally defaulted, state law controls. *Thomas v. McCaughtry*, 201 F.3d 995, 1000 (7th Cir. 2000). In Illinois, if a defendant does not raise an issue on direct appeal, he cannot subsequently raise those issues in a post-conviction proceeding. *People v. Coleman*, 168 Ill. 2d 509, 522 (1995) (holding that petitioner's failure to raise ineffective assistance of trial counsel claim, under Illinois law, resulted in waiver and claim was, thus, procedurally defaulted). This is because the Illinois Post-Conviction Hearing Act permits a defendant to mount a collateral attack on his conviction or sentence based on his constitutional rights, but the scope of that review is limited to issues that were raised on direct appeal. *Wright v. Walls*, 288 F.3d 937, 947 (7th Cir. 2002) (citing *Coleman*, 168 Ill. 2d at 522); *Wright v. Cowan*, 149 F. Supp. 2d 523, 533 (C.D. Ill. 2001) *aff'd sub nom. Wright v. Walls*, 288 F.3d 937 (7th Cir. 2002) (noting that if Illinois court declined to rule on a constitutional claim because the petitioner failed to present it properly, the federal habeas court may not review the merits of the issue). Thus, if a review of the record indicates that the post-conviction appellate court disposed of Clark's claims on the ground of waiver then his claims are procedurally defaulted.

The Respondent correctly points out that Count I and portions of Count II of Clark's petition are procedurally defaulted because they were disposed of by the post-conviction appellate court on the grounds of waiver. Although the record makes clear that the trial judge

never questioned the jurors *sua sponte* about the possibility of bias towards gang members, Clark did not raise this issue on direct appeal. Nor did he argue on direct appeal that his trial counsel was ineffective for failing to question jurors about potential gang bias, or for failing to request an accomplice-witness instruction. Accordingly, the post-conviction appellate court found that Clark had waived both of these arguments as well. Because it is well established that waiver is an adequate and independent state law ground those arguments are indeed procedurally defaulted, and the Court is precluded from reaching their merits.[6] *See*, *e.g.*, *Sturgeon*, 552 F.3d at 611.

### B. Merits of Clark's Remaining Claims

With respect to Clark's claims that are not procedurally defaulted, relying on § 2254(d), the Respondent contends that the state courts reasonably applied federal law. Section 2254(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA") states that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1). Thus, unless a state court's ruling is contrary to, or an unreasonable application of, federal law, then courts may not issue a habeas petition.

A state court's decision is contrary to clearly established federal law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court did] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's decision rests on an unreasonable

---

[6]A petitioner's procedural default of a claim may be excused if the petitioner demonstrates that a miscarriage of justice would occur or that he is actually innocent, but here Clark alleges neither. *Schlup v. Delo*, 513 U.S. 298, 314 (1995); *Gladney v. Pollard*, 799 F.3d 889, 895 (7th Cir. 2015).

application of federal law "if the state court's ruling on the claim being presented in federal court was so lacking justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Under this deferential standard of review, "this Court may only issue a writ of habeas corpus if 'the state court's application of governing federal law is . . . shown to be not only erroneous, but objectively unreasonable.'" *Bartlett v. Battaglia*, 453 F.3d 796, 799 (7th Cir. 2006) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003)). "The requirement that a habeas court find that the state court's decision unreasonably applied clearly established federal law is a difficult standard to meet; 'unreasonable' means 'something like lying well outside the boundaries of permissible differences of opinion.'" *Bartlett*, 453 F.3d at 800 (internal citation omitted). Applying this deferential standard of review, the Court cannot conclude that the state courts unreasonably applied federal law to Clark's non-defaulted claims.

### 1. Ineffective Assistance of Trial Counsel: Trial Counsel's Failure to Advise Clark to Accept Plea Deal

Clark contends that his trial counsel's advice concerning a proffered plea bargain that called for a twenty-year prison term constituted ineffective assistance of counsel. The Respondent maintains that the Supreme Court has never expressly held that counsel must tell a defendant whether to accept a plea deal, but that misframes Clark's argument. Clark's complaint is not that his lawyer didn't press him to accept the proposed deal, but that he rejected the deal because his lawyer overstated the prospects for his success at trial. Clark asserts that his lawyer indicated that he had a 90 percent chance of acquittal and that he had an "open and shut" case for acquittal and that in providing these overly optimistic views, his lawyer gave him constitutionally deficient counsel.

Claims of ineffective assistance of counsel are governed by the framework set forth in

*Strickland v. Washington*:

> A convicted defendant's claim that counsel's assistance was so
> defective as to require reversal of a conviction or death sentence
> has two components. First, the defendant must show that counsel's
> performance was deficient. This requires showing that counsel
> made errors so serious that counsel was not functioning as the
> "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable. Unless a defendant makes both showings,
> it cannot be said that the conviction or death sentence resulted
> from a breakdown in the adversary process that renders the result
> unreliable.

466 U.S. 668, 687 (1984).

Here, the post-conviction appellate court did not unreasonably conclude that Clark's

claim failed to satisfy the first prong of *Strickland*. Under the performance prong of *Strickland*, a

defendant must show that his counsel's representation fell below an objective standard of

reasonableness. *Id.* Making this already differential standard of review even more differential is

that on habeas review "'the question is not whether [Clark's] counsel's actions were reasonable.

The question is whether there is any reasonable argument that [Clark's] counsel satisfied

*Strickland's* deferential standard.'" *McElvaney v. Pollard*, 735 F.3d 528, 532 (7th Cir. 2013)

(quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)); *see also Long v. Butler*, 809 F.3d 299,

312 (7th Cir. 2015) ("On habeas review, a federal court determines whether the state court's

application of the ineffective assistance standard was unreasonable."). If there is, this Court must

defer to the state court's conclusion. And with all ineffective assistance of counsel claims, there

is a "strong presumption that the attorney performed effectively." *Long*, 809 F.3d at 312.

It is true enough that "clearly established federal law" holds that the Sixth Amendment

right to effective counsel extends to the plea-bargaining process, and has since at least 1985. *See*

*Hill v. Lockhart*, 474 U.S. 52, 57 (1985) (holding that *Strickland* analysis applies to attorney representation during plea-bargaining process). During plea negotiations defendants are entitled to the effective assistance of competent counsel. *See Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). That includes the right to be informed of the offer of a plea bargain (*see Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012)) and the right to competent advice about whether to accept or reject a plea offer (*see Lafler*, 132 S. Ct. at 1384). But that is not to say that there is a right to have counsel dictate whether a defendant should accept a plea bargain. Once a client has rejected a plea offer, trial counsel has no obligation to press defendant to change his mind. *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014) (counsel was not constitutionally deficient for failing to "press a plea offer on a defendant who has already rejected any such offer"). Indeed, the model rules of professional conduct instruct that once a plea offer is communicated to a client, the decision to accept or decline that offer rests solely with the defendant. *See* Model Rules of Prof'l Conduct R. 1.2(a).

The state post-conviction appellate court applied the *Strickland* standard, and concluded—with the benefit of the record from an extensive evidentiary hearing on this question—that the performance of Clark's trial counsel with respect to the plea offer was not objectively unreasonable. In finding Clark's performance with respect to the state's plea offer constitutionally sufficient, the post-conviction appellate court noted that there was no basis to conclude either "that counsel misjudged defendant's case or gave erroneous advice," finding credible the testimony of Clark's trial counsel that he did not provide Clark or his family with any numerical odds of success at trial or other assessment that the case was "open and shut." *People v. Clark,* 2013 WL 4047653 at ¶ 91. And even if he had provided such a prognostication, "an erroneous strategic prediction about the outcome of a trial is not necessarily deficient

performance." *Lafler*, 132 S. Ct. at 1391. Laying 9-to-1 odds on success at trial still leaves open

a 10 percent chance of failure, and Clark offers no basis to conclude that the allegedly proffered

odds were not accurate. To the contrary, he persists in his arguments that the trial *should* have

come out as he claims that his attorney predicted it *would* come out. He does not explain why his

trial counsel was objectively unreasonable for agreeing with a view of the evidence that, Clark

continues to maintain, was appropriate. What Clark seeks, then, is a second chance at a deal with

the benefit of hindsight, but that is not what *Strickland* provides. There is no Supreme Court

authority for the proposition that an attorney whose prediction about the results of trial turns out

to be wrong has for that reason rendered constitutionally defective assistance. Where Supreme

Court cases "give no clear answer to the question presented, let alone one in [the petitioner's]

favor," it cannot be said that the state court unreasonably applied Supreme Court law and thus

"relief is unauthorized." *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008).

Certainly *Lafler* and *Frye*, on which Clark relies, do not establish that proposition, and

the state appellate court appropriately distinguished those cases factually.[7] As to *Lafler,* the state

court noted that the defendant had rejected a favorable plea offer because of his trial counsel's

stipulated deficient performance in advising petitioner to reject an offered plea deal "on the

grounds he could not be convicted at trial." 132 S. Ct. at 1384. The deficiency in trial counsel's

advice in *Lafler* was never expressly identified, but was stipulated by the parties, so the Court

had no reason at all to consider whether the actions by trial counsel were, in fact, objectively

unreasonable; the case focused instead on the prejudice prong of the *Strickland* test. Here, of

---

[7] *Frye* and *Lafler* post-date Clark's trial by some 15 years, so to the extent that they established any new constitutional rule not grounded on existing law, Clark would not be able to rely on them even if they did support his argument. *See, e.g., Brecht v. Abrahamson*, 507 U.S. 619, 634 (1993) (citing *Teague v. Lane*, 489 U.S. 288 (1989), and noting that new rules "seldom have retroactive application to criminal cases on federal habeas").

course, there was no similar stipulation, and Clark's trial counsel indicated that he never gives numerical odds or tells clients that they have an "open and shut" case. ECF No. 18-10, Ex. J, 17. Instead, he indicated that he met with Clark and discussed the strengths and weaknesses of the case with him. Thus, the state court appropriately concluded that *Lafler* was inapposite.

In distinguishing *Frye*, the post-conviction appellate court noted that in that case the defendant's attorney had rendered deficient performance when he failed to inform the defendant of a formal, favorable plea offer before that offer expired, and the defendant established that there was a reasonable probability that he would have accepted that offer. *See Frye*, 132 S. Ct. at 1410-11. But unlike in *Frye*, the post-conviction court reasoned, Clark never contended that his attorney failed to inform him of the prosecution's offer, and Clark had in fact rejected that offer outright.[8] Thus, *Frye*, too, is inapposite, as the state court concluded.

The state court's handling of these ineffective assistance claims provides no basis to set aside the deference AEDPA otherwise requires. The state court appropriately identified that the applicable federal law was *Strickland* and then reasonably applied that standard. The state court's conclusion that because Clark failed to offer any facts indicating his trial counsel's performance was constitutionally deficient, he had failed to satisfy *Strickland's* performance prong was not an unreasonable application of federal law as set forth by the Supreme Court. Accordingly, the post-conviction appellate court's determination that Clark's trial counsel provided constitutionally sufficient representation will not be disturbed. *See Groves*, 755 F.3d at 591; *see also McElvaney*, 735 F.3d at 532.

---

[8] According to testimony by the prosecutor during the post-conviction evidentiary hearing (which the post-conviction court credited), Clark's counsel had communicated the twenty-year offer to Clark, who allegedly responded by telling the state to "go screw [them]selves or 'F' [them]selves." ECF No. 18-10, Ex. J, 7.

## 2. Ineffective Assistance of Appellate Counsel: Failure to Raise Waived Claims

As he did in post-conviction proceedings, Clark next maintains his appellate counsel was constitutionally defective for failing to raise his procedurally defaulted claims and for failing to argue that certain witness testimony was erroneously admitted under exceptions to the rule against hearsay. The Respondent argues that because the witness testimony of Jones and Kelly was deemed admissible under Illinois law, "these state law rulings are unchallengeable in federal habeas." Resp., ECF No. 17, 14. As a technical matter, the Respondent misstates the issue. Clark is not challenging the admissibility of those statements. Instead, he is arguing that his appellate counsel was constitutionally deficient for failing to challenge the admission of those statements on direct appeal. Because a criminal defendant has a constitutional right to effective counsel on direct appeal, Clark raised an appropriate issue for federal habeas review. *United States ex rel. Shore v. O'Leary*, 833 F.2d 663, 668 (7th Cir. 1987) (noting, "Because the admissibility of evidence in state court is a matter of state law, evidentiary questions are not subject to federal review under § 2254 ***unless there is a . . . denial of a specific constitutional right***") (emphasis added)); *Lilly v. Gilmore*, 988 F.2d 783, 785 (7th Cir. 1993) (noting there is constitutional right to competent appellate counsel). Clark's claim still fails on its merits, however, because the post-conviction court reasonably concluded that Clark's appellate counsel made a strategic decision in declining to raise claims that stood little chance of success.

As he does here, in his post-conviction appeal Clark first maintained that his appellate counsel was constitutionally defective for failing to argue that the trial court should have questioned the venire about any potential bias against gang members. The post-conviction appellate court determined that this did not amount to constitutionally deficient performance. The panel noted that although at the time of Clark's trial there was significant media coverage

concerning ongoing federal trials against the Gangster Disciples, the trial court's voir dire had probed the venire for media exposure relating to these cases. As a result of this questioning, the parties dismissed a number of potential jurors from the panel. This indicated, the panel reasoned, that the voir dire that was conducted properly probed for bias and specific questioning pertaining to gangs was unneeded. Moreover, Clark did not contend that any potential juror displayed gang bias and was allowed to remain on the jury. Thus, the court concluded that Clark's appellate counsel did not render deficient representation in declining to raise the voir dire issue on direct appeal.

There is nothing at odds between the state court's resolution of this issue and controlling Supreme Court law. The state court reasonably applied the standard set forth in *Strickland*'s first prong (objective unreasonableness) and found the claim wanting, correctly observing that "a trial court has no duty to *sua sponte* question potential jurors regarding gang bias." 2013 WL 4047653 (Ill. App. 1 Dist.) at ¶ 11. The Supreme Court had not so held at the time of Clark's 1997 trial, as the Seventh Circuit subsequently noted in *Gardner v. Barnett*, 199 F.3d 915, 921 (7th Cir. 1999) (*en banc*) ("Although the Constitution does require inquiries into certain biases (such as race) . . . bias against street gangs is not among them."). And, indeed, the Court has not so held to this day. *See, e.g., United States v. Mordi*, 277 F. App'x 613, 616 (7th Cir. 2008) (approvingly citing *Gardner*). Given the absence of any such requirement, and the questioning that the trial court did conduct, there is no basis to conclude that the state appellate court's resolution of this issue was contrary to clearly established federal law, particularly keeping in mind that, as noted above, in evaluating *Strickland* claims, a double-dose of deference is due. *See Richter,* 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both highly

deferential, and when the two apply in tandem, review is doubly so.") (internal quotations and citations omitted).

Second, Clark argued that his appellate counsel was ineffective for failing to challenge on appeal the trial court's admission of the "hearsay" statements of Chairs—his alleged coconspirator—and ASA Kelly's testimony that Clark's girlfriend did not vouch for Clark's whereabouts the night of the murders. The post-conviction appellate court concluded that both issues were meritless, and thus Clark's appellate counsel did not err in declining to raise them on appeal. ECF No. 18, Ex J, 15. With respect to Chairs' statements, the court concluded they were plainly admissible under the Illinois coconspirator exception to the rule against hearsay.[9] *Id.* The court reasoned that non-hearsay evidence had established a prima facie showing that a conspiracy existed between Chairs, Booker, and Clark: all three were members of the same gang; Chairs and Clark were both high ranking members within that gang; Chairs and Clark had previously been to the bar together; and Jones had seen the trio walk into the bedroom with Martin shortly before the murders occurred. *Id.* All of the statements offered into evidence were either made during the course of the conspiracy, or immediately after it in an attempt to cover it up. *Id.*

As to Kelly's testimony, at trial Clark's defense counsel objected on hearsay grounds to his testimony that Clark's girlfriend did not corroborate his alibi. *Id.* at 16. But the trial court allowed the testimony "for the limited purpose of what [Clark] did next, not for the truth of the matter asserted." *Id.* The trial court also gave the jury a limiting instruction reiterating that the

---

[9] To the extent that Clark's petition claims that his trial counsel was ineffective for failing to challenge the admission of Chairs' statements, it is unfounded. As the post-conviction appellate court opinion sets forth, the state moved for the admission of Chairs statements as coconspirator statements before trial and they were admitted "over trial counsel's objection." 2013 WL 4047653 ¶ 76.

jury was not to consider the evidence for any purpose other than the limited purpose for which it was admitted. The post-conviction appellate court determined that the testimony was properly admitted because it was only offered to show that Clark subsequently changed his story after being confronted with the fact that his girlfriend did not support his alibi.[10] Thus, because the statements were not offered for the truth of the matter asserted, there was no basis upon which Clark's appellate counsel could have argued they were admitted erroneously. Accordingly, the post-conviction court reasoned, Clark's appellate counsel was not constitutionally deficient for declining to raise the hearsay issue because it was meritless.

This ruling, too, is consistent with a proper consideration and application of *Strickland*. Apart from the state appellate court's substantive analysis of the hearsay issues, which is sound, application of the *Strickland* standard here would also have to take into account that an appellate challenge to these evidentiary questions would have been reviewed under a forgiving abuse of discretion standard and, if found to have been an abuse of discretion, then under a harmless error standard. *See, e.g., Holbert v. Superintendent,* 2015 WL 859553, *5 (S.D. Ind. Feb. 27, 2015). There is no basis to conclude that Clark's appellate counsel was objectively unreasonable in forgoing these hearsay arguments in light of these obstacles (much less that the state appellate court was objectively unreasonable in reaching that conclusion).

*Strickland* does not require appellate counsel to raise every possible issue on direct appeal. *See Makiel*, 782 F.3d at 898. Indeed, "when appellate judges address professional education programs on appellate practice, they . . . always stress [the] need for careful selection of just a few issues on appeal." *Id.* This is because not only are briefs "limited in length but also

_____
[10] The post-conviction appellate court also concluded that the claim regarding ASA Kelly's statements was barred by *res judicata* because the issue had, in fact, been raised and decided on direct appeal. *See* 2013 WL 4047653 ¶ 87 and n.10.

because the more issues a brief presents the less attention each receives, and thin representation may submerge or forfeit a point." *Knox v. United States*, 400 F.3d 519, 521 (7th Cir. 2005). As the state court appropriately concluded, neither of these arguments had merit and it did not violate the required standards for constitutionally effective representation not to pursue them.

### 3. Sufficiency of the Evidence: State Court's Application of *Jackson v. Virginia*

In Count IV of his habeas petition, Clark argues that he was not proven guilty beyond a reasonable doubt because the state failed to sufficiently prove he was accountable for the murders of Martin and Meza. As the state appellate court noted, *Jackson v. Virginia*, 443 U.S. 307 (1979), is the appropriate federal authority for sufficiency of the evidence challenges. *See id.* at 319. In measuring the sufficiency of the evidence, *Jackson* instructs that the "inquiry does not require a court to ask itself whether ***it*** believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* (emphasis in original). Instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* As discussed previously, the Court's threshold task on habeas review is not to reapply federal law de novo, but to determine whether the state court's application of that federal law was objectively unreasonable. *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (citing *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)). Thus, in the context of a sufficiency of the evidence challenge, the precise legal question presented is whether it was "objectively unreasonable for the Illinois Appellate Court to conclude that any rational trier of fact, after viewing the light most favorable to the state, could have found the essential elements of first degree murder beyond a reasonable doubt." *McFowler v. Jaimet*, 349 F.3d 436, 447 (7th Cir. 2003) (internal citation omitted). Here,

it was not unreasonable for the state court to conclude that a reasonable jury could have found Clark guilty of murder on the basis of an accountability theory.

The Illinois accountability statute required the government to prove, beyond a reasonable doubt, that Clark (1) solicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the offense; (2) did so before or during the commission of the offense; (3) and did so with the concurrent, specific intent to promote or facilitate the commission of the offense. 720 Ill. Comp. Stat. Ann. 5/5-2(c). Although the mere presence of a defendant at the scene of a crime does not render him or her accountable for the underlying offense, *see People v. Reid*, 136 Ill. 2d 27, 61 (1990), "active participation has never been a requirement for the imposition of guilt upon the theory of accountability." *People v. Smith*, 278 Ill. App. 3d 343, 355-56 (1996). And proof that the defendant was present during the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). The law of accountability incorporates the "common criminal design" rule, which provides that when two or more people engage in a common criminal design, any act carried out in furtherance of that common design is attributed to all parties. *Smith*, 278 Ill. App. 3d at 356.

In applying this law to the facts presented at trial, the state appellate court concluded that a rational trier of fact could have found Clark guilty on an accountability theory because there was sufficient circumstantial evidence that Clark agreed to aid Chairs in robbing Meza, and that Meza and Martin were killed during the course of that robbery. *Clark*, 97 CR 29109, ECF No. 18-4, Ex. D, 15. The court noted that Chairs' girlfriend, Stacy Jones, testified that she was present on multiple occasions when Chairs discussed with Clark his plan to steal marijuana from

the "Mexican." *Id.* Jones also testified that on the day of the murders she heard Chairs tell Clark that he was getting ready to "rip off the Mexican." *Id.* And although the state appellate court did not make the point expressly, Jones testified that on the afternoon of the murders, Chairs told her that he was dropping her off so that "we"—a reference that clearly included Clark, who was in the car at the time—could go carry out the robbery. To these statements, Clark expressed no protest or reluctance; instead, he climbed into the front seat alongside Chairs, a move that a jury could reasonably infer manifested his assent to the plan.

The court further noted that the testimony of Tanya Robinson placed Clark with Chairs at John's Club the evening the murders occurred. *Id.* Robinson testified that she saw Clark enter into the bar's backroom with Martin, Chairs, and Booker. She indicated that she then overheard some sort of argument occurring in the backroom. *Id.* The clear import of her testimony about what she heard, moreover, was that it was Clark she heard telling others in the room, "He knows where it's at. He knows where it's at." Although she could not identify the voice, she ruled out the other individuals who she knew to be in the room as the source of this comment. Shortly after the argument subsided, Booker exited the room, approached her, and threatened to kill her if she told anyone about what she had heard. *Id.* The investigating detective testified that he found Martin and Meza lying strangled to death in the same room that Robinson saw Martin enter with Clark and his codefendants. *Id.*

The court further reasoned that inconsistencies in Clark's accounts of his whereabouts the night of the murders provided additional circumstantial evidence of his guilt. *Id.* at 15-16. Although Clark attempted to offer an alibi for his whereabouts the night of the murder, ASA Kelly testified that Clark changed his story when he was told his girlfriend's statement to police did not support that alibi; when confronted with this statement, Clark abandoned his claim that

he had never been to John's Club and acknowledged that he had been to the bar, albeit on the night before the murders. *Id.* In applying *Jackson,* the state appellate court concluded that the testimony of these witnesses, taken together, was sufficient for a reasonable jury to conclude that Clark accompanied his accomplices to John's Club with the intent to rob the "Mexican," and in the course of that robbery, Martin and Meza were murdered.

The state court did not unreasonably apply *Jackson* to the prosecution's evidence offered at Clark's trial. In his petition, Clark argues that no reasonable jury could have found him liable for murder because the case against him was based entirely on circumstantial evidence. While it is true that there was no direct or physical evidence linking him to the murder, Clark's assertion that there was no direct evidence relevant to his conviction is neither correct (Robinson's testimony that she saw Clark go into the bedroom where the bodies were found is direct evidence of his presence at the scene of the crime) nor relevant; circumstantial evidence can be the sole basis for a conviction. *See, e.g.*, *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) (noting "[a] verdict may be rational even if it relies solely on circumstantial evidence."); *McFowler*, 349 F.3d at 456 (reversing district court's grant of habeas petition because circumstantial evidence reasonably supported jury's finding that defendant was guilty of murder under an accountability theory); *Garlington v. O'Leary*, 879 F.2d 277, 285 (7th Cir. 1989) (holding that circumstantial evidence was sufficient for a reasonable jury to conclude defendant was guilty of murder); *United States ex rel. Sharp v. Acevedo*, No. 08 C 1668, 2009 WL 2032929, at *7 (N.D. Ill. July 10, 2009) (on habeas review holding that circumstantial evidence was sufficient to support defendant's murder conviction). And here, viewing this circumstantial evidence in the light most favorable to the prosecution, it was not manifestly unreasonable for

the state court to conclude that a rational jury could have found that Clark agreed to assist Chairs in robbing Meza, and that during the course of that robbery Meza and Martin were murdered.

Clark argues that the circumstantial evidence that was used to convict him was unreliable. He maintains that the testimony of Tanya Robinson placing him at the murder scene should be discredited in its entirety because she was a drug addict, had previously lied to the detectives who were investigating the murder, and had received compensation to relocate in exchange for her testimony. Pet., ECF No. 1, 13. But the parties' direct and cross examination of Robinson presented these potentially impeaching facts to the jury, and the jury was in the best position to assess the credibility of Robinson and give her testimony the weight it deserved. It is not the province of a reviewing court to reassess that credibility determination. *Schlup v. Delo*, 513 U.S. 298, 330 (1995) (noting that "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review"); *United States ex rel. Shore v. O'Leary*, 833 F.2d 663, 668 (7th Cir. 1987) (affirming murder conviction under *Jackson* and noting "the long-established principles that veracity of a witness be tested by cross-examination and credibility of a witness be determined by the trier of fact."). The state court did not, therefore, misapply *Jackson* in declining to second guess the jury's evaluation of the credibility of the trial witnesses.

Accordingly, the state court did not unreasonably apply *Jackson* in evaluating Clark's sufficiency of the evidence claim and habeas relief based on that claim is not warranted.

### 4. Prosecutorial Misconduct: Improper Argument during Closing Statements

Clark's final argument on habeas review relates to statements the prosecution made during its rebuttal argument. Specifically, Clark argues that the prosecutor's comments about how the "Gangster Disciples operate" deprived him of his right to a fair trial. Clark also maintains that the prosecutor made comments that impermissibly shifted the burden of proof

away from the government and onto him. In response, the Respondent argues that the prosecutor never directly commented on Clark's failure to testify. As to the prosecutor's comment on how the Gangster Disciples operate, the Respondent contends that Clark suffered no prejudice as a result of those comments. Both of these issues were presented on direct appeal and both were rejected by the panel's majority with one judge dissenting. As discussed previously, the task before the Court on habeas review is to determine whether the state court majority unreasonably applied clearly established Supreme Court precedent in rejecting Clark's arguments. The state court rulings as to these matters do not contravene clear Supreme Court precedent, however, and where Supreme Court cases "give no clear answer to the question presented, let alone one in [the petitioner's] favor," it cannot be said that the state court unreasonably applied Supreme Court law and thus "relief is unauthorized." *Wright*, 552 U.S. at 125-26. Accordingly, the Court denies Clark's claims based on the prosecution's rebuttal argument.

(a) **Prosecutor's Alleged Comment on Clark's Failure to Testify**

Clark argues that the prosecutor impermissibly commented on his failure to testify and shifted the burden of proof to him, when he made the following argument in rebuttal:

> "He [Clark's counsel] wants you to find the defendant not guilty because nobody saw Tommy Clark go out around the back. Nobody saw Tommy Clark around the back. Nobody saw Tommy Clark come back out. Nobody saw Tommy Clark come and take the money from the cash register. No one saw that. Well, when this defendant talked to the police, what did he tell the police? He tells the police, I don't know nothing about no murders. I don't know anything about that. So then Assistant State's Attorney Kelly talks to him a little bit longer, and we come with up [sic] story with the girlfriend. Well, that doesn't quite work, because we talked to the girlfriend. Okay. Listen, Mr. Clark, you're about to stand in a line-up. [objection overruled]. Facts. I want to talk to you about—you want to talk about facts? I didn't hear one fact from this table over here regarding a statement.

Supp. R., ECF No. 27-1, Ex. A at 159. The dissent agreed with Clark, opining that "[t]he implication of the statement 'I didn't hear one fact from this table' is that the defendant has failed to offer any evidence to rebut the State's case. This is tantamount to impermissible burden shifting." *Id.* at 25. In affirming the trial court's ruling that the comment was proper, however, the majority reasoned that the prosecutor was merely illustrating that no one contradicted Kelly's testimony about Clark changing his story after detectives told Clark he was being placed in a lineup. *Clark*, 97 CR 29109, ECF No. 18-4, Ex. D at 20. The Respondent also maintains that the prosecutor did not directly comment on Clark's failure to testify and that because the "Supreme Court 'has not addressed a prosecutor's indirect references to a defendant's failure to testify'" Clark's claim is barred by the absence of controlling Supreme Court precedent. Resp., ECF No. 17, 13 (citing *United States ex rel. Lovett v. McAdory*, No. 99 C 3004, 2004 WL 816549, at *6 (N.D. Ill. Mar. 16, 2004)).

As the Respondent notes, before the Court can reach the question of whether the state court majority unreasonably applied established federal law in finding the prosecutor's remarks proper, Clark "must have a Supreme Court case to support his claim, and that Supreme Court decision must have clearly established the relevant principle as of the time of his direct appeal." *Yancey v. Gilmore*, 113 F.3d 104, 105-07 (7th Cir. 1997). The closest case that supports Clark's claim is *Griffin v. California*, 380 U.S. 609 (1965), which held that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 614. In *Griffin*, also a murder case, "[t]he prosecutor made much of the failure of petitioner to testify:

> The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment and went down the alley with her. . . . He would know that. He would know how she got down the alley. He would know how the blood got on the

> bottom of the concrete steps. He would know how long he was
> with her in that box. He would know how her wig got off. He
> would know whether he beat her or mistreated her. He would know
> whether he walked away from that place cool as a cucumber when
> he saw Mr. Villasenor because he was conscious of his own guilt
> and wanted to get away from that damaged or injured woman.
> These things he has not seen fit to take the stand and deny or
> explain. And in the whole world, if anybody would know, this
> defendant would know. Essie Mae is dead, she can't tell you her
> side of the story. The defendant won't.

*Griffin*, 380 U.S. at 610–11.

Compounding the problem, the trial judge then instructed the jury that:

> As to any evidence or facts against him which the defendant can
> reasonably be expected to deny or explain because of facts within
> his knowledge, if he does not testify or if, though he does testify,
> he fails to deny or explain such evidence, the jury may take that
> failure into consideration as tending to indicate the truth of such
> evidence and as indicating that among the inferences that may be
> reasonably drawn there from those unfavorable to the defendant
> are the more probable.

*Id.* at 610. The Supreme Court went on to note that the state court's instructions had

impermissibly shifted the burden of proof onto the defendant and acted as "a penalty imposed by

the courts for exercising a constitutional privilege." *Id.* at 614.

*Griffin,* then, involved direct, substantial, and unambiguous comments from the

prosecution referring to the defendant's silence and an instruction from the court advising the

jury of the circumstances under which it was permitted to draw an adverse inference from a

defendant's decision not to testify. *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) ("*Griffin*

prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's

silence as substantive evidence of guilt."). That is direct commentary about the defendant's

silence that expressly invites the jury to consider the defendant's decision not to testify as

evidence of guilt. *Yancey*, 113 F.3d at 107 ("*Griffin* involved only direct comment upon the

accused's decision not to testify."). And as the Respondent correctly notes, the Supreme Court

has not addressed situations involving a prosecutor's indirect comments on a defendant's failure to testify. *Diggs v. Hulick*, 236 Fed. App'x 212, 215 (7th Cir. 2007) (*Griffin* "prohibited only 'direct' prosecutorial references to the defendant's failure to testify; *Griffin* did not reach the issue of whether a prosecutor may comment on the evidence in such a way that indirectly refers to a defendant's silence."); *Freeman v. Lane*, 962 F.2d 1252, 1260 (7th Cir. 1992) ("Comments by the prosecutor on the state of the evidence that may indirectly refer to the defendant's silence . . . have not been the subject of direct Supreme Court guidance.").

The scenario at issue here simply does not implicate *Griffin*. Here, the trial judge did not instruct the jury that it was permitted to consider the defendant's silence at trial; rather, the trial court properly instructed the jury that "[t]he fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict." And here, the state appellate court addressed a statement that did not refer directly to the defendant, but rather included an ambiguous reference to "this table over here." While all seem to have understood this to be a reference to the defense *table,* it was not necessarily a reference to the *defendant* rather than to *defense counsel*. The prosecutor's argument began as a direct response to defense counsel's argument that there was no evidence about what, if anything, Clark did in the bedroom where the victims were found,[11] pointing out that the evidence of Clark's own inconsistent statements implicated him in the murders. The comment at issue was immediately preceded by a rhetorical question—"you want to talk about facts?"—which was a clear rejoinder to comments near the

---

[11] Clark's trial counsel argued: "We don't know where Tommy went, if you believe that he was there. He went in the back. Do you have any evidence as to where Tommy went? Did he go out the back door? Do we know whether he withdrew, came back, went out? Do we know this? This is a murder case, ladies and gentlemen. . . . No guessing, no speculating, no conjecture." Dkt. 27-1, Tr. 151. Counsel closed, and provided the predicate for the prosecutor's subsequent rhetorical question ("Facts? You want to talk about facts?"), by stating: "When you apply the law, you have to apply facts with it, too. You have got to apply facts, and if the facts aren't there, the law says that you must find this man not guilty." *Id*. at Tr. 156.

end of defense counsel's closing argument, in which he told the jury that there were no facts to prove Clark guilty:

> When you apply the law, you have to apply facts with it, too. You have got to apply facts, and if the facts aren't there, the law says that you must find this man not guilty.

ECF 27-1, at T-156.

In this context, the prosecutor's comments could reasonably be understood as an attempt to respond to the defense argument that the facts did not prove Clark guilty by harkening back to Clark's shifting alibi stories, the subject he was discussing when he made the comment in question. So understood, the prosecutor's comment does not implicate Clark's decision not to testify at trial because it simply highlights the inference to be drawn from the evidence admitted at trial, not the absence of the defendant's testimony from the witness stand. And indeed, in a follow up discussion, the prosecutor explained that he was commenting on defense counsel's failure to cross-examine ASA Kelly about Clark's statement, not the defendant's decision not to testify, and the trial judge confirmed that was how he had understood the prosecutor's comments. *Id*. at T-199-200. *Cf. United States v. Robinson*, 485 U.S. 25, 31 (1988) ("we do not think that an appellate court may substitute its reading of ambiguous language for that of the trial court and counsel").

Moreover, even if the prosecutor's comment were construed as "direct" notwithstanding the absence of explicit reference to the defendant or his decision not to testify, the Supreme Court has held that *Griffin* does not bar all commentary on a defendant's silence at trial. *See Robinson*, 485 U.S. at 31-32. In *Robinson*, the Court found it permissible for the prosecutor to comment directly on the defendant's decision not to testify when the "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by the defendant or his counsel." *Id.* at 32. The Court instructed that the view "that any 'direct' reference by the

prosecutor to the failure of the defendant to testify violates the Fifth Amendment as construed in *Griffin* [is incorrect]. We decline to give *Griffin* such a broad reading, because we think such a reading would be quite inconsistent with the Fifth Amendment." *Id.* at 31-32.

*Robinson*, which teaches that to assess a claim of improper comment on a defendant's decision not to testify "must be examined in context," 483 U.S. at 33, provides the controlling methodology for consideration of the prosecutor's comment about having heard nothing from "this table over here" about Clark's statement to ASA Kelly. The state appellate court did exactly what *Robinson* requires,[12] noting that the trial judge had properly instructed the jury and reviewing the prosecutor's comments "in the context of the entire closing statements of the parties." Based on its review, the state appellate court concluded that "[t]he prosecutor was just illustrating that no one contradicted Kelly's testimony about defendant changing his story, which is what the prosecutor continued to argue after the objection." Resp't Ex D, ECF 18-4, at 20.

That conclusion was not objectively unreasonable. While the remark may not have been permissible under this Circuit's precedent,[13] the Supreme Court has not held that references to "uncontradicted" or "unrefuted" evidence constitute improper comment on a defendant's failure to testify, even when no one else could have offered such evidence.[14] *Yancey*, 113 F.3d at 106

---

[12] The state appellate court did not cite *Robinson*, but that omission does not matter given that its approach was consistent with *Robinson*'s teaching. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (holding "that a state court need not even be aware of [Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them).

[13] Circuit precedent holds that references to uncontradicted evidence "violate the Fifth Amendment only if a defendant is the 'only person capable of contradicting, denying, rebutting, disputing, challenging, or controverting the evidence at issue.'" *United States v. Jones*, 600 F.3d 847, 857 (7th Cir. 2010) (citing *Yancey,* 113 F.3d at 106).

[14] Clark's petition and reply do not make the argument that no one else could have contradicted Kelly's testimony—probably because the prosecutor's comment went not to the absence of evidentiary contradiction regarding Clark's statements to Kelly but to the absence of any explanation of Clark's inconsistent statements *from defense counsel* during his closing

(Supreme Court has never endorsed the argument that characterization of evidence as unrebutted or uncontradicted infringes a defendant's Fifth Amendment right not to testify at trial); *Diggs*, 236 Fed. App'x at 215 (reiterating *Yancey*'s holding "that a state court neither contravenes nor unreasonably applies *Supreme Court* precedent if the state court condones a prosecutor 'commenting upon the unrebutted and uncontradicted nature of testimony' in order to emphasize the strength of the state's case") (emphasis in original).[15] *Yancey*'s holding requires the conclusion that the state appellate court's view was not an unreasonable application of controlling Supreme Court precedent and deference to the state court's view is therefore required.

In short, the prosecutor made an ambiguous comment that the state trial and appellate courts concluded, not unreasonably in the context of the rest of the arguments offered by the parties, did not invite the jury to treat the defendant's decision not to testify at trial as substantive evidence of his guilt. Accordingly, Clark's habeas petition on this ground fails.

### B. Prosecutor's Argument Concerning the Gangster Disciples

Clark also maintains that he was deprived of his right to a fair trial when the prosecutor stated in his rebuttal argument that the Gangster Disciples entered into criminal agreements with a "nod" or "wink" and insinuated that Clark actually winked or nodded at Chairs when he disclosed his plan to rob "the Mexican," even though no such evidence was offered at trial.

During closing arguments, the theme of Clark's defense was that the prosecution had failed to prove its case beyond a reasonable doubt. Specifically, Clark's attorney maintained that

---

argument. Moreover, Clark was not the only witness who could have testified about any of Clark's statements, as Detective Sikarski was present for the initial interview session with Clark.

[15] To the contrary, when that argument was made in *Lockett v. Ohio*, 438 U.S. 586, 594-95 (1978), the Supreme Court rejected it (albeit in the context of a case in which defense counsel had already suggested to the jury that the defendant would testify).

the State failed to offer any evidence that Clark had agreed to assist or aid Chairs in the robbery

of "the Mexican":

> Agrees to aid. Where's the agreement? He didn't say a word. Where's the agreement? Or attempts to aid. Where's the attempt? What was the attempt? What was the attempt to aid in the commission of this crime, of the murder, of this robbery? Where is it? Where's the attempt?

During his rebuttal argument, the prosecutor responded, stating:

> In this case, the rank was held by governor, [Chairs]. His assistant governor was [Clark]. He doesn't—the Gangster Disciple guys, like these two, they don't sit around in front of Stacy [Jones] and lay out the whole plans for 'em. They are not stupid. It doesn't take that. It takes a nod, a wink, jumping in the front seat, to know you are going along with the plan. That's reality. That's how the Gangster Disciples operate.

Clark's attorney then objected, but the trial judge overruled the objection and the

prosecutor continued:

> You don't need that. You think . . . this Governor, needed to hear every time he made an assertion about how they were going to rob Kevin and the Mexican? Do you think he needed to hear [Clark] say, oh yeah, gov, I'm right with you, let's go get the bud and the jewelry, and maybe get the money. Of course not. That's nonsense. That's not real life. It's not how it works. But he's there, and he's agreeing with them, and more importantly, when push comes to shove, when it's August 21st, 1997, and when the gov makes a declaration to his girlfriend that they are going to go take the bud, he jumps in the front seat and he's right there, ready to go.

Clark's position with respect to these comments is consistent with the view expressed by

the dissenting appellate court judge:

> The prosecution presented to the jury matters beyond the evidence presented. I can think of no greater prejudice to a criminal defendant than to have the prosecution ostensibly manufacture evidence out of whole cloth. Not only did the prosecutor essentially testify as to how the Gangster Disciples operate, thereby placing himself in a position for which he was not a qualified expert, he implied that the wink and the nod actually took place.

*Id.* at 24.

While acknowledging that it is improper for a prosecutor to misstate the evidence or to argue facts not in evidence, the appellate court made no finding as to the propriety of the prosecutor's statements here. The court instead went directly to the question of prejudice and concluded that "[given] the content and the context, we find that the statements by the prosecutor did not substantially prejudice defendant." Resp't Ex. D, ECF No. 18-4, at 21-22. Consistent with the approach taken in the state court majority opinion, the Respondent focuses on the question of prejudice rather than the propriety of the comments, and argues that the comments did not deprive Clark of a fair trial.

As previously discussed, on habeas review, a state court's decision will not be disturbed unless it unreasonably applied clearly established federal law. 28 U.S.C. § 2254(d)(1). "The 'clearly established Federal law' relevant here is [the] decision in *Darden v. Wainwright* . . . which explained that a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). *Darden* established a two-part framework to evaluate "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" 477 U.S. at 181. First, the court evaluates whether the prosecutor's comments were improper. *Id.* Second, if the comments were improper, the court asks whether the defendant was prejudiced by them—meaning, that the improper comments rendered the trial "fundamentally unfair." *See id.* at 181-83.

In finding Clark suffered no prejudice from the prosecutor's remarks, the appellate court cited Illinois law that tracks *Darden*. *See* ECF No. 18-4, Ex. D, 21-22; *see also Mitchell v.*

*Esparza*, 540 U.S. 12, 16 (2003) (holding "that a state court need not even be aware of [Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them"); *compare People v. Williams*, 192 Ill.2d 548, 573 (2000) ("[I]f prosecutorial comment exceeds the bounds of proper argument, the verdict must not be disturbed unless . . . the remark caused substantial prejudice to the defendant . . . taking into account the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial."), *with Darden*, 477 U.S. at 181 ("The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.").

Because the state court's ruling was not premised on the propriety of the prosecutor's comments about the way the Gangster Disciples operated, this Court need only review whether the state court reasonably applied *Darden's* prejudice prong.[16] *See Bartlett v. Battaglia*, 453 F.3d 796, 802 (7th Cir. 2006). Under *Darden's* prejudice prong, the question of whether a new trial is constitutionally required should focus on six factors: (1) whether the prosecutor misstated evidence; (2) whether the remarks implicate specific rights of the accused; (3) whether defense invited the response; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut. *Darden*, 477 U.S. at 181-83; *Ellison v. Acevedo*, 593 F.3d 625, 636 (7th Cir. 2010). The appellate court's opinion provides essentially no explanation for its conclusion that the comments at issue did not prejudice Clark, but the

---

[16] Because finding a constitutional error under the *Darden* framework includes a finding of prejudice, no independent finding that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict" is needed. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (holding that for certain constitutional violations there is no need for further harmless error review because a finding of a violation would likewise be a finding of "a reasonable probability that, had [the violation not occurred], the result of the proceeding would have been different").

absence of explanation does not itself forfeit AEDPA deference: "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Review of the factors *Darden* identifies as relevant to the prejudice inquiry shows that it is not objectively unreasonable to conclude, as did the appellate court majority, that the comments in question did not deprive Clark of a fair trial.

To begin with the first *Darden* factor (whether the comments misstated the evidence), the claim here is that they did so because the prosecution presented no evidence about how "the Gangster Disciples operate" or that gang members acquiesced to criminal activity by non-verbal acts such as "a nod, a wink, jumping in the front seat." The premise of this argument is simply wrong, however; there *was* evidence of "how the Gangster Disciples operate" without the need for explicit confirmation of their willingness to participate in crimes. The state presented evidence that Chairs and Clark were both high ranking members of that gang; that Chairs, the higher ranking member, appointed Clark as an Assistant Governor; that Clark's duties consisted of providing assistance as Chairs directed; that Chairs determined the plan and made the decisions that were communicated to Clark, who then demonstrated his commitment to the plan by, on one occasion, trying to create a cash roll that would deceive the drug supplier into believing that Chairs had enough cash to pay for the drugs, and on another jumping into the front seat of the car Chairs was driving when he announced that it was time to "rob the Mexican."

To the extent that Clark's argument is that the prosecutor's comments misstated the evidence because (in the words of the dissenting judge) "he implied that the wink and a nod actually took place," that argument effectively acknowledges that the prosecutor did ***not*** expressly claim that Clark nodded or winked at Chairs to show his assent to the plan. What the

prosecutor said is that "it doesn't take" an express statement to assent to a criminal plan; "it takes a nod, a wink, jumping in the front seat, to know that you are going along with the plan." In this context, the references to "a nod" or "a wink" can reasonably be understood as examples of what it does take: non-verbal statements that—like jumping into the front seat—demonstrate one's agreement to participate in a crime. That is the point the prosecutor made immediately thereafter when he told the jury: "Do you think this Governor . . . needed to hear [Clark] say, oh yeah, gov, I'm right with you . . . ? Of course not. That's nonsense. That's not real life. It's not how it works." It is reasonable to construe the prosecutor's comments, then, as a more general statement about the "real life" manner in which those planning a crime are likely to demonstrate assent rather than a specific assertion that the evidence showed that, consistent with Gangster Disciple operating procedures, Clark winked at Chairs to manifest his assent to the robbery plan.

Although the Court finds this broader interpretation of the prosecutor's comments to be more reasonable than the more literal interpretation provided by the dissenting appellate court judge, none of this is to say that a jury could not have understood the prosecutor's comments as set forth in the dissenting opinion. But to obtain relief, it is not enough for Clark to show that there is another plausible, or even more plausible, interpretation of the comments at issue. Rather, Clark must demonstrate that the state court was objectively unreasonably in concluding that he was not prejudiced by the prosecutor's comments. His argument to that effect falls short, however, and the existence of a competing interpretation that provides a reasonable basis to argue that the prosecutor did not misstate the evidence weighs heavily against a finding of prejudice.

*Darden*'s second factor considers whether the comments at issue implicate specific rights of the accused—that is, rights other than the right to a fair trial. Here, where the claim is that

comments misstated evidence, no other specific right is implicated. Further, the Seventh Circuit has noted that even where remarks to a jury directly implicate fundamental constitutional guarantees, like the right to be convicted only upon proof beyond a reasonable doubt, it "cannot be said" that a prosecutor's remarks—as opposed to instructions or other commentary by the trial judge—"implicate the due process clause." *Bartlett,* 453 F.3d at 802.

Consistent with the third *Darden* factor, in concluding that the prosecutor's comments did not deprive Clark of a fair trial, the appellate court majority noted that the comments had been made in response to defense counsel's argument that there was no evidence that Clark had agreed to participate in the Chairs' plan to "rob the Mexican." That defense argument was itself a mischaracterization of the evidentiary record; plainly there was evidence from which one could infer Clark's agreement, as has already been discussed. And while a defendant's mischaracterization of the evidence does not give the prosecution similar license to misrepresent the evidentiary record, the remarks that precipitated the prosecutor's argument inform the reasonable interpretation of those comments. Here, the defendant's lawyer said there was no evidence that the defendant agreed to participate in the robbery that led to the murders; the prosecutor responded to that argument by noting that no express manifestation of assent is necessary and that, given their relationship and respective ranks in the gang, Clark's agreement with Chairs' plan could reasonably be inferred from his conduct.

It bears noting in connection with consideration of this factor and the fourth *Darden* factor (remedial action taken by the trial court) that in response to the prosecutor's comments, Clark's attorney lodged only a single, unspecified, objection, which the trial judge overruled. Given that ruling, it appears that the trial judge did not understand the prosecutor to be inventing evidence from whole cloth, as Clark suggests. Clark's attorney, moreover, did not request a side

bar or further elaborate on the objection at the close of the argument (as he did with respect to his concern about the prosecutor's alleged comment on the defendant's decision not to testify), so there is nothing in the record that even confirms the basis for his objection. That neither Clark's attorney nor the trial judge thought any curative instruction was needed on the basis of these remarks provides further reason to doubt that the comments were not construed at the time as an improper mischaracterization of the record rather than as a derisive response by the prosecutor to the defendant's claim that there was no evidence of his agreement to "rob the Mexican."

Further, *Darden* instructs courts to consider the trial court's instructions to the jury when analyzing the impact of a prosecutor's improper argument. *Darden*, 477 U.S. at 181. Here, the trial court's instructions to the jury, which followed immediately upon the conclusion of the state's rebuttal argument, included appropriate admonitions that "the evidence which you should consider consists only of the testimony of the witnesses and exhibits which the Court has received." The trial court also provided detailed instructions to the jurors about the closing arguments of counsel and any misstatements of the record that they might have made:

> Closing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements not closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.

And, of course, the trial court also instructed the jury that, "The state has the burden of proving the guilt of the defendant beyond a reasonable doubt[.]"

These instructions provide adequate assurance that the trial court's failure to provide a contemporaneous limiting instruction (assuming, for the sake of argument that one was needed) did not deprive Clark of a fair trial. As the Seventh Circuit has noted in similar circumstances, jurors are not likely to credit arguments by trial counsel that contravene the court's instructions

to the jury. In *Bartlett*, for example, the Seventh Circuit concluded that, even in the absence of a contemporaneous limiting or corrective instruction, it would be "folly" to conclude "that an offhand and arguably prejudicial argument made by an attorney is of greater weight than a court's instructions." *Bartlett*, 453 F.3d at 803. There, the prosecutor improperly characterized the proof-beyond-a-reasonable-doubt standard, but the Seventh Circuit found that the state court did not improperly apply *Darden* because, in part, the trial court's instructions provided the appropriate guidance to the jury. *See also, e.g.*, *Ellison v. Acevedo*, 593 F.3d 625, 637 (7th Cir. 2010) (instructions "that the opening statements and closing arguments of the attorneys were not evidence" "would likewise have disabused the jury of any confusion the prosecutor's comments may have caused"). So too here; the jury was told unequivocally to disregard any statements of the attorneys that were inconsistent with the testimony of the trial witnesses and the exhibits admitted during the trial. It is not, therefore, unreasonable to conclude that the jury did not improperly credit the prosecutor's comments about the evidence (even if they are understood as Clark suggests).

Under *Darden*, the weight of the evidence against the defendant is also a factor to be considered. The relationship, of course, is inversely correlated: the stronger the evidence, the less likely the improper remark influenced the outcome. The evidence against Clark in this case was not, it must be acknowledged, overwhelming, but the Court has already rejected Clark's contention that the evidence was insufficient to convict; the jury had ample basis to infer that he contributed to the robbery and death of Meza and Martin. And while not overwhelming, the evidentiary record here is not at equipoise; it was more than sufficient to carry the day for the state even absent the alleged boost from the prosecutor's comments. And it seems doubtful, moreover, that the comments provided much, if any, boost to the state's case even if they were

understood by the jurors to suggest that there was also evidence of a nod and wink between Chairs and Clark. The reference to "a wink" or "a nod" adds little, if any, force to the argument that these two individuals worked closely together as ranking members in an organization devoted to criminal activities and were therefore on the same page when it came to the plan to rob a drug dealer, even if Chairs was the only one who explicitly stated his intention to participate in the robbery. The evidence supported the claim that Clark climbed into the front seat and accompanied Chairs when Chairs announced that it was time to "rob the Mexican"; telling them that the duo exchanged some other form of agreement as well, such as a nod or a wink, surely did not tilt the jury to conviction when it would otherwise have leaned toward acquittal—or, at least, it would not be unreasonable for the state court to so conclude.

Finally, although Clark did not have an opportunity to rebut the prosecutor's comments about "the way the Gangster Disciples operate," the discussion above establishes that the inability to respond directly to these comments should not be accorded great weight. As discussed, the significance of these comments was not great and the trial court's jury instructions were sufficient to counteract any unfair prejudice arising from the prosecutor's statements. *Bartlett*, 453 F.3d at 804.

Based on all of the foregoing factors, the Court concludes that the state appellate court's conclusion that the prosecutor's "wink and a nod" comments did not deprive Clark of a fair trial was not objectively unreasonable.

***

For the reasons stated above, Clark's petition for a writ of habeas corpus is denied.

Dated: February 21, 2017

John J. Tharp, Jr.
United States District Judge